951 F.2d 365
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
WESTERN POWER SPORTS, INC., Plaintiff-Appellant,
v.
POLARIS INDUSTRIES PARTNERS L.P.; Polaris Industries L.P.;
Polaris Industries Associates L.P.; Polaris
Industries Capital Corporation,
Defendants-Appellees.
 No. 90-35359.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 11, 1991.
Decided Dec. 11, 1991.
As Amended Dec. 23, 1991.
 
 Before JAMES R. BROWNING, CANBY and TROTT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Polaris Industries (Polaris) is a manufacturer of snowmobiles, all-terrain-vehicles (ATVs) and other products. Polaris is the only manufacturer that sells snowmobiles to wholesale distributors; other snowmobile manufacturers sell directly to retailers. Western is a wholesale distributor of snowmobiles and other products. Beginning in the late 1980's, Polaris allegedly required its snowmobile distributors, including Western, to purchase specified quantities of ATVs and terminated the snowmobile distributorship agreements of distributors who failed to purchase their allotment of ATVs.
 
 
 3
 When the market for ATVs experienced a serious downturn, Western objected to this arrangement. Eventually, Western refused to purchase the allotted number of Polaris ATVs and Polaris terminated its snowmobile distributorship. This suit followed. Western alleges Polaris had imposed an illegal "tying arrangement" in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, section 3 of the Clayton Act, 15 U.S.C. § 14, and Idaho antitrust law. Western also asserts other state law claims. The district court granted summary judgment for Polaris on all claims. We reverse.
 
 
 4
 To establish a tying arrangement that is illegal per se, the plaintiff must show (1) the tying of two products; (2) defendant had sufficient economic power in the tying product market to affect the tied product market, and (3) an effect on a substantial volume of commerce in the tied product market. Bhan v. NME Hospitals, Inc., 929 F.2d 1404, 1411 (9th Cir.1991).
 
 
 5
 A tying arrangement exists when a seller refuses to sell one product (the tying product) unless the purchaser agrees to purchase another product (the tied product). Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5 (1958); Bhan, 929 F.2d at 1411. The district court concluded there was a genuine issue of material fact as to whether a tying arrangement existed. Viewing the evidence in the light most favorable to Western, see Tzung v. State Farm Fire And Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989), we reach the same conclusion. Western offered evidence sufficient to permit a trier of fact to decide Polaris had tied sales of the two products--that is, had required distributors to purchase ATVs in order to obtain snowmobiles--including a statement by Polaris' director of product development admitting the existence of a tying arrangement.[1]
 
 
 6
 To determine whether Polaris possessed sufficient power in the snowmobile market to affect commerce in the ATV market, the snowmobile market must first be defined. "Defining the relevant market is a factual inquiry...." Oltz v. St. Peter's Community Hospital, 861 F.2d 1440, 1446 (9th Cir.1988). Thus, the relevant market may be determined on summary judgment only if there is no genuine issue of material fact on this question. See Bhan, 929 F.2d at 1413 & n. 9.
 
 
 7
 Polaris offered evidence the relevant market was either the retail market for snowmobiles or the market for wholesale distributorships generally. However, Western offered evidence, including the testimony of Professor Whitelaw, sufficient to permit a trier of fact to find the tying product market was the wholesale market for snowmobiles.
 
 
 8
 Since the relevant market for the tying product was disputed, the district court could not conclude Polaris' power in that market was not sufficient to allow Polaris to affect a substantial volume of commerce in the tied product. If Western's evidence is credited, Polaris had 100% of the tying product market, presumptively sufficient to give Polaris the market power required to establish a per se violation. See Jefferson Parish Hospital Dist. No. 2 v. Hyde, 466 U.S. 2, 16 (1984) (defendant's monopoly of the tying market gives defendant sufficient market power to allow plaintiff to establish a per se violation).[2]
 
 
 9
 Polaris argues summary judgment was nevertheless appropriate because Western would not have purchased ATVs from any manufacturer if not compelled to purchase them from Polaris. Polaris relies on the following statement in Jefferson Parish:
 
 
 10
 [W]hen a purchaser is "forced" to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed.
 
 
 11
 466 U.S. at 16.
 
 
 12
 If interpreted as Polaris interprets it, this passage would appear to be at odds with another earlier in the Jefferson Parish opinion in which the Court said competition was restrained and the Sherman Act violated when the seller exploited its power over the tying product to force the buyer to purchase a tied product the buyer "either did not want at all, or might have preferred to purchase elsewhere...." 466 U.S. at 12 (emphasis added). But see Wells Real Estate, Inc. v. Greater Lowell Board of Realtors, 850 F.2d 803, 814-15 (1st Cir.1988) (reconciling the two passages by interpreting the "no adverse impact" passage as applying to plaintiff's showing as to the "not insubstantial" volume of commerce foreclosed by the tie).
 
 
 13
 We need not resolve the ambiguity. The record did not establish the factual predicate for applying the Jefferson Parish statement Polaris relied upon, even read as Polaris would read it. Western offered evidence it was initially enthusiastic about selling Polaris' ATVs and there is no indication Western would have been any less enthusiastic about selling other manufacturers' ATVs. Evidence showed that when the retail ATV market declined, Western objected to Polaris' alleged practice of requiring it to purchase more ATVs than the retail market could bear, but this evidence does not establish Western wished to withdraw from the ATV business altogether. Western offered evidence to the contrary: It did wish to purchase ATVs, but simply not the number of ATVs Polaris demanded.
 
 
 14
 We conclude Western's claim that it was the victim of a tying arrangement that violated the Sherman Act per se should not have been rejected on motion for summary judgment.
 
 
 15
 We also conclude summary judgment was improper for Western's claim it was the victim of an unreasonable restraint of trade. Plaintiff may prevail without proof of per se illegality if it can establish the tying arrangement unreasonably restrained trade in the tied product market. See Jefferson Parish, 466 U.S. at 29. The rule of reason analysis requires the fact-finder to "analyze the anti-competitive effects along with any pro-competitive effects to determine whether the [arrangement] is unreasonable on balance." Bhan, 929 F.2d at 1413; see also Arizona v. Maricopa County Medical Society, 457 U.S. 332, 343 (1982). Here, the district court granted Polaris' motion for summary judgment on the ground that the tying arrangement's positive effects on competition outweighed its negative effects.
 
 
 16
 There were genuine issues of material fact regarding the reasonableness of the tying arrangement. By forcing its snowmobile distributors to distribute its ATVs, Polaris effectively precluded its distributors from entering the wholesale market for ATVs and the market for ATV distributorships. Though the tying arrangement may also have had pro-competitive effects, we cannot say as a matter of law that these effects outweighed the arrangement's anti-competitive effects.[3]
 
 
 17
 Similarly, summary judgment must be reversed with respect to Western's claim under Idaho Code § 48-101. The Idaho Supreme Court has recognized that federal decisions interpreting the Sherman Act offer "persuasive guidance" in interpreting and applying Idaho Code § 48-101. Pope v. Intermountain Gas Co., 646 P.2d 988, 994 n. 11 (Idaho 1982). The district court granted summary judgment on this claim solely on this ground. Because we reverse the district court's judgment with respect to the Sherman Act claim, we must also reverse the judgment as to the section 48-101 claim.
 
 
 18
 We also reverse the district court's judgment with respect to the Clayton Act claim. The district court concluded the Clayton Act claim fails because wholesale distributorships are not "goods, wares, merchandise, machinery, supplies or other commodities" within the meaning of section 3 of the Clayton Act, 15 U.S.C. § 14. We disagree. In Chelson v. Oregonian Publishing Co., 715 F.2d 1368 (9th Cir.1983), a newspaper publishing company allegedly prohibited its retail distributors from distributing advertising inserts for another company. Id. at 1369. We rejected the defendant's claim that the case involved services, not goods, and was therefore outside the scope of section 3, because the agreement between the newspaper company and its distributors provided the distributors would purchase goods (newspapers) from the company and resell them to readers. Id. at 1372. Similarly, Western purchased goods (snowmobiles and ATVs) from Polaris and resold them.
 
 
 19
 Polaris argues section 3 does not apply because Western never actually purchased any unwanted ATVs. Polaris cites Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc., 637 F.2d 1376 (9th Cir.1981), which held section 3 inapplicable when there was no "executed agreement." Id. at 1389. Polaris interprets Ron Tonkin to require an actual payment of money and delivery of goods. However, Ron Tonkin used the term "executed agreement" to distinguish an actual contract from "an offer to enter into an exclusive dealing arrangement." Id. at 1388 (original emphasis). Further, the plain language of section 3 states either a sale or a contract for sale will suffice. 15 U.S.C. § 14 ("It shall be unlawful ... to lease or make a sale or contract for sale of goods ... on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... of a competitor ... of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition....") (emphasis added).
 
 
 20
 Western offered evidence it reluctantly executed a purchase order for 825 Polaris model ATVs in September 1987 in order to keep its snowmobile distributorship. That purchase order is sufficient to invoke section 3. See Smith Machinery Co. v. Hesston Corp., 878 F.2d 1290, 1298-99 (10th Cir.1989) (citing Ron Tonkin for proposition section 3 requires a contract for sale and stating a purchase order would have constituted such a contract).
 
 
 21
 The district court held that even if section 3 applied, Western failed to establish the effect of the tie-in "may be to substantially lessen competition," relying on Moore v. Jas. H. Matthews & Co., 550 F.2d 1207, 1214 (9th Cir.1977). Moore held "this standard is met either if the seller enjoys sufficient economic power in the tying product market to appreciably restrain competition in the tied product market or if a not insubstantial volume of commerce in the tied product market is restrained." Id. As we have said, there was a genuine issue of material fact as to the relevant tying product market and no challenge by either party to the district court's finding that the tying arrangement affected a substantial volume of commerce in the ATVs.
 
 
 22
 Western also alleges Polaris violated Idaho Code § 48-104 (intentionally driving another out of business) and the covenant of good faith and fair dealing implicit in contracts under Idaho law. The district court ruled against Western on these claims only because it ruled against Western on the tying issues. Accordingly, these claims too will be open on remand.
 
 
 23
 REVERSED and REMANDED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Polaris' contention that the distributorship termination merely reflected Polaris' refusal to acquiesce in Western's attempt to evade its voluntary contractual obligation to purchase the ATVs simply raises a question for the jury. This factual dispute illustrates why the grant of summary judgment was improper
 
 
 [2]
 Neither Polaris nor Western challenges the district court's determination that the tying arrangement affected a substantial volume of commerce in ATVs, the tied product
 
 
 [3]
 Summary judgment of the unreasonable restraint of trade claim was also inappropriate because establishing the relevant market is critical to the rule of reason analysis. Oltz, 861 F.2d at 1446. As we have said, there was a genuine issue of material fact as to the relevant market